UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DOUGLAS REDDEN, : Case No. 1:09-cv-330
:
     Plaintiff, : Judge Herman J. Weber
: Magistrate Judge Timothy S. Black
vs. :
:
COMMISSIONER OF :
SOCIAL SECURITY, :
:
     Defendant. :

**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-
DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL
EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

     This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to disability insurance benefits ("DIB") and supplemental security income

("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 18-30) (ALJ's decision)).

**I.**

     On March 9, 2006, Plaintiff filed an application for DIB and SSI, alleging that he

became disabled on March 1, 2005, due to cirrhosis of the liver, anxiety, depression,

orthopedic problems (right shoulder, arm, and hand, low back and legs), and social

phobia.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendation.

(Tr. 18, 46-48, 62-74).[2]

Upon denial of Plaintiff's claims on the state agency levels, he requested a hearing *de novo* before an ALJ. A hearing was held on September 17, 2008, at which Plaintiff appeared with counsel and testified. (Tr. 553-590). A vocational expert, Janet E. Chapman, was also present and testified. (*Id.*)

Following the hearing, the ALJ issued a final administrative decision on October 14, 2008, denying benefits. (Tr. 15-30). The Appeals Council denied Plaintiff's request for review. (Tr. 8-11). Plaintiff then filed the action that is presently before this Court.

Plaintiff was thirty-three years old as of October 14, 2008, the date of the ALJ's decision. (Tr. 46). He finished eleventh grade, obtained his GED, and completed "some college." (Tr. 73, 246, 559). From 1989 to 1994, Plaintiff worked various jobs such as stocker, laborer, tire company employee, tree trimmer, and valet (Tr. 75), but had minimal earnings after 1994, and quit working altogether in 1996 after contracting cirrhosis of the liver (Tr. 49-61, 97). Plaintiff reported that he received welfare and Medicaid. (Tr. 560). At the time of the hearing, he was single and lived with his parents in their home. (Tr. 559).

---

[2]  Plaintiff filed an earlier application for benefits in the 1990's, which was denied at the initial and reconsideration levels, but approved by an ALJ on March 26, 1997. (Tr. 18, 556). The claimant's entitlement to benefits ceased, and Plaintiff received his last disability check in February 2005. Therefore, Plaintiff chose March 1, 2005 as his onset date for the applications currently at issue. (*Id.*)

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since March 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: right shoulder degenerative joint disease, status-post multiple surgeries; right knee arthritis, status-post a right femur fracture; hepatitis C (severe until August 2008); and panic disorder/post-traumatic stress disorder/social phobia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one fo the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the requirements of work activity except as follows: He can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for six hours in an eight-hour workday. He can only occasionally stoop, kneel, crouch, and climb ramps and stairs. He should not crawl, climb ladders, ropes, or scaffolds, or reach above shoulder level with the right upper extremity. He should not work at unprotected heights. He can remember and carry out only short and simple instructions. He cannot interact with the general public, and can interact with coworkers and supervisors only occasionally. He cannot work at a rapid production-rate pace. He is able to make only simple work-related decisions. Any job he could perform should not require more than ordinary and routine changes in the work setting or duties.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 3, 1975, and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a high school equivalent education (a GED) and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-29).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI.  (Tr. 30).

On appeal, Plaintiff argues that: (1) the ALJ erred when he improperly weighed the psychological opinions of record; (2) the ALJ erred when he improperly weighed the physical medical opinions of record; and (3) the ALJ erred when he found that Plaintiff retained the ability to perform jobs listed by the vocational expert.  Each argument will be addressed in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

For his first assignment of error, Plaintiff maintains that the ALJ erred when he improperly weighed the psychological opinions of record.

The relevant medical record reflects the following:

The record contains select information relating to Plaintiff's impairments that were pertinent to the cessation of his benefits in February 2005. Some of this information is also relevant to Plaintiff's current disability claims, as explained below.

**Pre-March 2005 Substance Abuse, Psychological, and Mental Records**

Plaintiff started drinking alcohol and using other drugs as a teenager. (Tr. 480). He was involved in a motor vehicle accident in November 1996 while under the influence of alcohol, and the passenger in his vehicle was killed. (Tr. 240). He was psychiatrically hospitalized after the November 1996 accident. (*Id.*) Plaintiff was convicted of vehicular homicide, served five years in prison, and was released in September 2002. (*Id.*). He participated in outpatient psychiatric treatment for anxiety and depression before and after his prison term. (Tr. 480).

Plaintiff began therapy with a social worker, Tom Burnside, around November 2003.[3] (Tr. 459). In August 2004, Mr. Burnside opined that Plaintiff had social phobia, depression, and anxiety that limited his social interaction, but that Plaintiff had few limitations with respect to following directions, remembering, sustaining concentration, and reacting to work pressures. (Tr. 459, 460). Mr. Burnside stated that if an employer is "patient, understanding and flexible, [Plaintiff] could probably learn to handle a job that is not physically demanding." (Tr. 460).

---

[3]     Mr. Burnside stated that he saw Plaintiff on a "regular basis" starting around November 2003 until sometime in early 2005. (Tr. 530). The record contains no treatment notes from Mr. Burnside until February 2006, and thus it is unclear exactly how frequent these visits were or what transpired during these sessions.

During a consultative psychiatric examination in September 2004 with Dr. David Chiappone, Plaintiff claimed that he stopped drinking alcohol around April 2004. (Tr. 480). Dr. Chiappone diagnosed Plaintiff with depression, anxiety, post-traumatic stress disorder, and substance abuse in remission. (Tr. 482). He concluded that Plaintiff could understand simple job instructions, maintain concentration and attention, and was "at most" mildly impaired in his ability to interact with the public or co-workers. (*Id.*). Dr. Chiappone measured Plaintiff's Global Assessment of Functioning ("GAF") score at 55, indicating moderate difficulty in social and occupational functioning. (*Id.*). He also found that Plaintiff had mildly reduced stress tolerance but was "capable of doing basic tasks." (*Id.*)

Dr. Marianne N. Collins, Ph.D., completed a psychiatric review of Plaintiff in November 2004. (Tr. 464-77). She determined that Plaintiff would have only mild limitations with respect to social functioning and maintaining concentration. (Tr. 474). Dr. Collins concluded that Plaintiff was able to relate adequately to family, friends, and coworkers, but would have "some difficulty" with the public. (Tr. 476). She noted that "[s]ignificant medical improvement has occurred." (*Id.*)

In February 2005, the same month Plaintiff's disability benefits ceased, Plaintiff entered alcohol and heroin detoxification. (Tr. 143-48). During detox, Plaintiff admitted he had been using IV heroin three to four times a day and drinking between six and twelve pints of beer a day. (Tr. 143). He stated that this had been going on for several

years and was getting worse. (*Id.*). His narcotic usage was noted to be in remission in March 2005 (Tr. 189), and, in May 2005, he claimed that he had not consumed alcohol since around the time he entered detox (Tr. 154).

**Pre-March 2005 Physical Medical Records**

Plaintiff injured his right shoulder and fractured his right femur in the November 1996 accident and had three surgeries on his right shoulder prior to March 1, 2005. (Tr. 492). He began seeing Dr. Thomas R. Yuellig, in October 2002, complaining of pain in his right shoulder and right leg. (Tr. 195). The records indicate that Plaintiff visited Dr. Yuellig approximately once every other month from May 2003 until March 2005, the alleged disability onset date, for leg and shoulder pain, among other ailments. (Tr. 190-194, 197-209).[4] Dr. Yuellig prescribed various medications (*Id.*) and conducted several lab tests during this time (Tr. 210-223). His notes contain few details about his clinical observations. (Tr. 190-194, 197-209). In August 2004, Dr. Yuellig concluded that Plaintiff's physical and mental impairments "preclude[d] any form of gainful employment." (Tr. 196).

In December 2004, Plaintiff was diagnosed with hepatitis C, contracted by IV use of heroin. (Tr. 150). Dr. Rajesh A. Joseph, Plaintiff's hepatologist, concluded that Plaintiff could not start therapy for hepatitis C due to his substance abuse issues. (Tr.

---

[4]    Plaintiff also complained of back pain. Several tests taken between November 2002 and January 2005 revealed mild disc degeneration, minimal posterior disc bulging, and mild scoliosis of the spine, but no fractures or subluxation. (Tr. 168, 176, 329-331, 350-353).

151).  Dr. Joseph referred Plaintiff to a rehabilitation center and advised that he see a psychiatrist before beginning treatment for hepatitis C.  (Tr. 149).

Also in December 2004, Plaintiff visited Dr. Gary L. Ray, for a consultative examination.  (Tr. 492-94).  Dr. Ray found that Plaintiff had good knee support, despite some tenderness.  (Tr. 493-94).  He opined that Plaintiff would be able to lift and carry up to ten pounds, sit without restrictions, stand for up to an hour at a time and handle objects without difficulty with his left hand, but should avoid work that required reaching overhead with the right upper extremity.  (Tr. 494).  He also found that Plaintiff could perform occasional bending, stooping, squatting, and kneeling, but should avoid crawling and climbing.  (*Id.*)

In early January 2005, Dr. Robert A. Weisenburger completed a physical functional capacity assessment for Plaintiff.  Dr. Weisenburger concluded that Plaintiff could perform a range of light work with a limited ability to reach overhead with the right shoulder.  (Tr. 485-487).  Plaintiff's benefit payments ceased in February 2005. (Tr. 18).

### Post-March 2005 Substance Abuse, Psychological and Mental Records

The records indicate that Plaintiff resumed counseling with Mr. Burnside for domestic issues and anxiety in February 2006, after a ten month absence.  (Tr. 530, 540).  Plaintiff visited Mr. Burnside every two to four months until early 2008.  (Tr. 530-549).  During a visit in February 2006, Mr. Burnside found that Plaintiff's mood, cognitive functioning, stream of thought, and content of thought were all normal.  (Tr. 542).  Plaintiff's GAF score was 67, indicating mild difficulty in social and occupational

functioning, and Mr. Burnside noted that Plaintiff "will need to obtain employment." (*Id.*)

Plaintiff underwent a psychiatric examination in June 2006 by Dr. Kevin W. Eggerman. (Tr. 239-245). Plaintiff reported that he had last used alcohol in 2002 and after giving "evasive" statements, said he had last used other drugs a year ago. (Tr. 240). Dr. Eggerman noted fair concentration levels, moderate anxiety, and reported that Plaintiff's GAF score was 60 (moderate symptoms). (Tr. 243). He concluded that Plaintiff's ability to understand, remember, and carry out simple instructions was unlimited, and his ability to understand, remember, and carry out detailed instructions was only mildly limited. (Tr. 244). Dr. Eggerman further found Plaintiff's ability to interact with the public or coworkers was mildly to moderately limited. (*Id.*)

Plaintiff had an assessment completed later in June 2006, confirmed by Dr. Nancy McCarthy. (Tr. 272-291). She found that Plaintiff had almost no difficulties maintaining concentration and understanding and remembering and carrying out simple instructions. (Tr. 290). Furthermore, Dr. McCarthy concluded that Plaintiff had mild to moderate limitations in responding appropriately to work pressures, and "would be able to perform a job that required little change in duties and stress," "simple repetitive tasks," and "where contact with the general public is limited." (*Id.*)

Plaintiff had a drug relapse in November 2006 (Tr. 540) and underwent Oxycontin detox for prescription drugs in November 2007 (Tr. 437-38). In 2008, Plaintiff continued treatment to maintain independence from his previous substance abuse. (Tr. 425-28, 430-

34).

In February 2008, Mr. Burnside wrote a letter and completed a mental functional capacity assessment, stating that Plaintiff's emotional and physical limitations precluded his ability to function in any employment or social setting. (Tr. 530-32). He opined that Plaintiff would have marked difficulties sustaining concentration, maintaining regular attendance, and interacting with the public. (Tr. 532). Yet, he also concluded that Plaintiff would have no significant limitations understanding, remembering, and carrying out detailed instructions, sustaining an ordinary work routine, responding appropriately to criticism, or getting along with coworkers. (*Id.*).

### Post-March 2005 Physical Medical Evidence

Plaintiff continued to visit Dr. Yuellig from March 2005 until March 2006 and again from September 2007 through May 2008 for ailments such as back, leg, and abdominal pain. (Tr. 181-189, 371-393).[5] The record contains no treatment notes from Dr. Yuellig from March 10, 2006 through September 2, 2007, a span of nearly eighteen months. Dr. Yuellig's treatment notes contain very little detail of his clinical observations and diagnoses for Plaintiff. (*Id.*)

In April 2006, an X-ray and MRI on Plaintiff's right shoulder revealed AC joint separation with associated arthritis. (Tr. 409, 453). Plaintiff underwent a consultative

---

[5] In July 2005, Plaintiff complained to Dr. Yuellig of right elbow pain. (Tr. 185-86). He was diagnosed with right elbow epicondylitis and therapy and splinting were recommended. (Tr. 178-79). The medical record contains no further mention of this condition, and no elbow issues were noted in his next examination. (Tr. 246-53).

examination in early June 2006 by Dr. Loraine Glaser.  (Tr. 246-253).  She found he had diminished range of motion in his right knee with a "clicking" sound, and diminished range of motion in his right shoulder with normal muscle and grasp strength.  (Tr. 247, 248).  She determined that Plaintiff had very mild scoliosis in the spine and could bend to ninety degrees at the waist without difficulty, exhibiting normal range of motion.  (Tr. 247).  Dr. Glaser noted Plaintiff's own statement that he was unable to work due to right shoulder and knee pain, but then opined that Plaintiff would be able to perform at least a moderate amount of sitting, standing, bending, kneeling, pushing, pulling, lifting, and carrying, with only slight difficulty reaching overhead with his right arm.  (Tr. 248-49).  Dr. Glaser concluded that Plaintiff would have no difficulty grasping or handling objects and noted no visual, communicative, or environmental limitations.  (*Id.*)

Later in June 2006, Plaintiff underwent another surgery on his right shoulder.  (Tr. 322-24).  Plaintiff received treatment for his shoulder before and after this surgery from University Orthopedics and Sports Medicine (Tr. 254-71) and received medication for the pain (Tr. 318, 408).  He also saw a chiropractor (Tr. 397-406) and started attending physical therapy after his surgery (Tr. 524-26).  During a follow-up examination on August 1, 2006, Plaintiff said he was in "excruciating pain."  (Tr. 523).  However, he admitted that he had stopped attending physical therapy sessions, causing his shoulder to "scar down," and thus Plaintiff was instructed to resume physical therapy.  (*Id.*)  One exhibit in the record indicates Plaintiff attended another seven sessions after the examination, but the record includes no further details.  (Tr. 525-26).

In July 2006, a state reviewing physician, Dr. Walter Holbrook, concluded that Plaintiff could frequently lift or carry up to twenty-five pounds, occasionally lift or carry up to fifty pounds, could stand, walk, or sit for approximately six out of eight hours a day, and was unlimited in his ability to push or pull. (Tr. 295). He further found that Plaintiff would have difficulty reaching overhead with his right arm. (Tr. 297). Dr. Holbrook noted no visual, communicative, or environmental limitations. (Tr. 297-98).

Plaintiff began interferon treatment for hepatitis C in May 2007 (Tr. 316), and in April 2007, Dr. Yuellig reported that Plaintiff was "free" from hepatitis C (Tr. 375). However, Plaintiff continued to complain of leg, back and shoulder pain. In September 2007, an X-ray of Plaintiff's right shoulder revealed remote separation and loose bodies at the AC joint with old fracture deformity of the distal clavicle. (Tr. 516). An MRI from November 2007 on Plaintiff's spine revealed broad disc bulging and a mild spur. (Tr. 456). In late 2007, Plaintiff visited Dr. Mitchell Simons, and nerve studies conducted for Plaintiff's right leg showed a mild abnormality, but no indication of peripheral neuropathy. (Tr. 365-67).

Dr. Yuellig completed a physical functional assessment for Plaintiff in July 2008, opining that Plaintiff could stand for no more than ten minutes at a time, sit for only three hours per eight-hour work day, lift no more than ten pounds occasionally, and could not push, pull, or squat at all. (Tr. 369-70). He concluded that Plaintiff was "unable to do any vigorous activity." (Tr. 370). In August 2008, Dr. Yuellig found that Plaintiff was "physically and emotionally unable to maintain any form of meaningful employment" and

"totally and permanently disabled." (Tr. 528).

### Hearing Testimony and the ALJ's Decision

Plaintiff testified in front of the ALJ on September 17, 2008. (Tr. 558-584). He described his ailments, treatments and medications. (Tr. 563-570). He claimed that he could not lift ten pounds because of pain in his right shoulder, could stand for no more than an hour at a time because of right leg pain, and experienced back pain when he sat for too long. (Tr. 570-71). Plaintiff stated that physical therapy made his shoulder condition worse. (Tr. 575-76).

Plaintiff claimed that he had not drank any alcohol since 2002. (Tr. 574). When the ALJ pointed out that Plaintiff admitted to drinking alcohol when he entered detox in February 2005, Plaintiff said he lied then just so he could "get help to get off of [pain] medications." (Tr. 580). The ALJ also asked whether Plaintiff had used any street drugs. (Tr. 578). Plaintiff first responded that he had not used drugs since high school, but later said that he "tried" heroin for a "small time period" after the accident. (Tr. 578-79). Plaintiff testified that he struggled with concentration and memory (Tr. 576) and that he experienced hour-long anxiety attacks five days a week for the past twenty years (Tr. 572-74). He informed the ALJ that he could read, write, and do simple arithmetic (Tr. 560), and that he spent a typical day watching television and movies, taking naps, socializing with his mother, reading magazines, and helping his mother with housework (Tr. 580-82).

A vocational expert, Janet Chapman, reviewed Plaintiff's records and testified at the hearing. (Tr. 584-89). After Ms. Chapman determined that Plaintiff had no past

relevant work (Tr. 585- 586), the ALJ asked her whether there were jobs that a hypothetical right-hand dominant person similarly aged, educated, and experienced as Plaintiff would be capable of performing that required only unskilled work and was otherwise specifically limited.  (Tr. 586).  She responded that such jobs exist at the light and sedentary unskilled levels.  (*Id.*)  For light unskilled jobs, Ms. Chapman listed by way of example: cleaner (2,000 jobs locally, 343,000 nationally), stock clerk or order clerk (2,000 jobs locally, 251,000 nationally), and machine operators (160 jobs locally, 15,000 nationally).  (Tr. 587).  For sedentary unskilled jobs, Ms. Chapman listed by way of example: surveillance system monitor (150 jobs locally, 25,000 nationally), inspector or tester (100 jobs locally, 90,000 nationally), and clerical support (800 jobs locally, 144,000 nationally).  (*Id.*)  She confirmed that if the hypothetical person had to miss up to one day of work per month for medical reasons, that person would still be able to perform all of these jobs.  (Tr. 589).  Ms. Chapman testified that the jobs identified were consistent with the *Dictionary of Occupational Titles* (DOT).  (Tr. 587).

Plaintiff asserts that Mr. Burnside, Plaintiff's treating counselor, is "entitled to the most weight" in determining his mental residual functional capacity.  (Doc. 6 at 6).  Plaintiff cites Social Security Ruling (SSR) 06-03p as support, and states that "the ALJ must consider this treating source."  (*Id.*)  However, SSR 06-03p specifies that only "acceptable medical sources" can give medical opinions and be considered treating sources.  SSR 06-03p.  The regulations and rulings list social workers and counselors as "other" non-medical sources, not "acceptable medical sources."  *Id.*; 20 C.F.R. §§

404.1513, 416.913.  Therefore, the ALJ could not give Mr. Burnside's opinion controlling weight under the regulations.

To the extent that Mr. Burnside's opinions were evidence of Plaintiff's condition, the ALJ considered them and gave them the weight to which they were entitled.  (Tr. 27).  The ALJ gave little weight to Mr. Burnside's opinions in part because his later opinions were "glaringly inconsistent" with his earlier opinions.  (*Id.*)  In August 2004, Mr. Burnside found that Plaintiff had few limitations sustaining concentration, reacting to work pressures, and taking care of himself, and, in fact, could find a suitable job under the right circumstances.  (Tr. 460).  In February 2006, Mr. Burnside opined that Plaintiff's mood and cognitive functioning were normal, and that Plaintiff "need[ed] to obtain employment."  (Tr. 542, 545).  He acknowledged Plaintiff's GAF score was 67, which indicated only mild difficulty in social and occupational functioning.  (Tr. 545).  In early 2008, he concluded that Plaintiff would have no significant limitations understanding and remembering, carrying out detailed instructions, sustaining an ordinary work routine, and getting along with coworkers.  (Tr. 532).  Yet, Mr. Burnside concluded in February 2008 that Plaintiff was unable to perform any substantial gainful activity whatsoever.  (Tr. 531).[6]

Meanwhile, the other psychological source opinions, completed by licensed or certified psychologists or psychiatrists, addressed Plaintiff's substance abuses and were

---

[6]     Mr. Burnside also noted that he did not treat Plaintiff at all for a ten month period in 2005.  (Tr. 530).

more consistent with Mr. Burnside's earlier opinions regarding Plaintiff's work capacity. Dr. Chiappone concluded that Plaintiff could understand simple job instructions, maintain concentration and attention, was only mildly impaired in his ability to interact with the public or co-workers, and was "capable of doing basic tasks." (Tr. 482). Dr. Collins determined that Plaintiff would have only mild limitations with respect to social functioning and maintaining concentration and could relate adequately to coworkers. (Tr. 474, 476). Dr. McCarthy found that Plaintiff would haven almost no difficulties maintaining concentration, remembering and carrying out simple instructions and "would be able to perform a job that required little change in duties and stress" and that required "simple repetitive tasks." (Tr. 290). Dr. Eggerman concluded that Plaintiff's ability to understand, remember and carry out detailed instructions was only mildly limited and his ability to interact with the public was mildly to moderately limited. (Tr. 244).

Moreover, the Social Security Act prohibits a claimant from being found disabled "if alcoholism or drug addiction would...be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§423(d)(2)(C) (*re:* DIB), 1382c(a)(3)(J) (*re:* SSI). To determine whether alcoholism or drug addiction is such a "material contributing factor," the "key factor" the ALJ must examine is "whether [the Commissioner] would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. §§404.1535(b)(1) (*re:* DIB), 416.935(b)(1) (*re:* SSI). This is a two-pronged inquiry. The ALJ determines, first, "which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant]

stopped using drugs or alcohol." *Id.* §§404.1535(b)(2), 416.935(b)(2). The ALJ asks, second, "whether any or all of [the claimant's] remaining limitations would be disabling." *Id.* If the remaining limitations are deemed "disabling," the claimant is found "disabled" independent of his/her drug addiction or alcoholism. *Id.* §§404.1535(b)(2)(ii), 416.935(b)(2)(ii). If, on the other hand, the remaining limitations are found "not disabling," the claimant's drug addition or alcoholism is considered a "material contributing factor" for purposes of the Social Security Act, and the claimant is found "not disabled." *Id.* §§404.1535(b)(2)(i), 416.935(b)(2)(i). *Rehder v. Apfel,* 205 F.3d 1056, 1059-60 (8th Cir. 2000).

In short, Plaintiff believes the ALJ should have given the most weight to a non-medical source who did not see Plaintiff for nearly a year in the middle of treatment, did not treat Plaintiff's substance abuse issues, was inconsistent in his own opinions, and provided a functional assessment opinion contrary to all other psychiatric or psychological opinions in the record. The ALJ reasonably concluded and explained that Mr. Burnside's opinion should be given little weight while Dr. Eggerman's opinion was entitled greater weight given its consistency with the record as a whole. (Tr. 27).

Accordingly, Plaintiff has not demonstrated that the ALJ improperly rejected any medical opinion of record.

## B.

For his second assignment of error, Plaintiff claims that the ALJ erred when he improperly weighed the physical medical opinions of record.

Plaintiff claims that Dr. Yuellig's treating source opinion was entitled to "the most weight in the record" in determining his physical residual functional capacity because of "treatment relationship, length of this, supportability, and consistency," and that the ALJ failed to give "good reasons" for discounting his opinion. (Doc. 6 at 6, 7).

The Commissioner has ruled that it is considered "error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported" or "if it is inconsistent with other substantial evidence in the case record." SSR 96-2P. Here, as the ALJ explained, Dr. Yuellig's opinions about Plaintiff's work abilities were inconsistent with Dr. Yuellig's own medical records. (Tr. 27). The record contains no treatment notes by Dr. Yuellig between March 2006 and September 2007, a span of eighteen months, and the treatment notes surrounding this gap contain little detail regarding Plaintiff's progress or prognoses and offer little support for Dr. Yuellig's opinions. (Tr. 181-194, 197-209, 371-393).

For example, in July 2008, Dr. Yuellig concluded that Plaintiff could sit for no more than three hours in an eight hour workday, and could not squat at all, indicating severe problems with Plaintiff's back and knees. (Tr. 369). However, Dr. Yuellig failed to support this opinion. His treatment notes for the previous sixteen months made little mention of treating Plaintiff's back or knees other than generally noting that Plaintiff was experiencing "chronic pain" and "some back discomfort" and making no mention of significant clinical abnormalities. (Tr. 371-393). In fact, the record shows that Plaintiff had only very mild scoliosis in the spine and could bend ninety degrees at the waist

without difficulty (Tr. 247), and a nerve study conducted in late 2007 demonstrated only one mild abnormality in Plaintiff's right leg (Tr. 376). Therefore, Dr. Yuellig's own treatment notes fail to support his functional capacity conclusions.[7] Additionally, Dr. Yuellig's opinions contradict the medical record taken as a whole. In concluding that Plaintiff was "totally and permanently disabled" (Tr. 528), Dr. Yuellig opined that Plaintiff could stand for no more than ten minutes, lift only up to ten pounds, sit for only three hours, and could not push, pull, climb, crawl, or squat at all (Tr. 369-370).

By contrast, Dr. Ray found that Plaintiff could sit without restrictions, stand for up to an hour at a time, perform occasional bending, stooping, squatting, and kneeling, and experience no difficulties handling objects with his left hand. (Tr. 493-494). Dr. Weisenburger concluded that Plaintiff could sit, stand or walk for about six out of eight hours, occasionally lift and carry up to twenty pounds, and would have little difficulty kneeling, pushing, pulling, or crouching. (Tr. 485-486). He opined that Plaintiff had a limited ability to reach overhead with his right shoulder, but unlimited ability to handle, finger or feel with either hand. (Tr. 487). Dr. Glaser concluded that Plaintiff would be able to perform at least a moderate amount of sitting, standing, bending, kneeling, pushing, pulling, lifting and carrying, with only slight difficulty reaching overhead with his right arm and no difficulty grasping or handling objects. (Tr. 248-249). Dr. Holbrook

---

[7] Furthermore, Dr. Yuellig was not a mental health professional, and his opinions regarding Plaintiff's emotional capacity to perform work were not entitled to significant weight. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2)(ii) (ALJ to give less weight to opthalmologist with respect to claimant's neck pain if another physician specifically treated claimant's neck pain).

found that Plaintiff could frequently lift or carry up to twenty-five pounds, stand, walk or sit for approximately six out of eight hours a day, and was unlimited in his ability to push or pull but should occasionally avoid reaching overhead. (Tr. 295).

Therefore, the ALJ acted reasonably in according little weight to Dr. Yuellig's opinion.

Plaintiff argues that the ALJ should not have given Dr. Glaser the most weight because she concluded Plaintiff "could do only a mild-moderate amount of sitting, standing, and walking."[8] (Doc. 6 at 6). However, Dr. Glaser stated that Plaintiff could perform "at least a mild to moderate amount" of sitting, standing, and walking. (Tr. 249). Moreover, she specifically found in her assessment that Plaintiff could sit, stand or walk for approximately six hours in an eight hour workday. (Tr. 295). The ALJ reasonably gave Dr. Glaser's opinion significant weight, given its consistency with the record (*see Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651-52 (6th Cir. 2006) (an ALJ may adopt a reviewing physician's opinion over a treating physician's opinion when supported by the record)), and provided "good reasons" for how much weight he assigned to the relevant opinions (Tr. 27-28).

Accordingly, the ALJ's opinion is supported by substantial evidence.

---

[8]  Plaintiff also claims that the ALJ incorrectly found him noncompliant with his physical therapy. (Doc. 6 at 5). However, the ALJ actually stated that Plaintiff attended a few therapy sessions, stopped, and was then instructed to resume therapy. (Tr. 21-22). Although it appears Plaintiff resumed therapy, the record supports the ALJ's assertion that Plaintiff was not compliant with therapy for his shoulder immediately following surgery. (Tr. 523).

**C.**

For his final assignment of error, Plaintiff claims that the ALJ erred when he found that Plaintiff retained the ability to perform jobs listed by the vocational expert ("VE").

Plaintiff complains that although the ALJ found in his written decision that Plaintiff could not perform overhead work with his right arm, the ALJ failed to include that limitation when questioning the VE. (Doc. 6 at 3-5). Plaintiff asserts that the ALJ's omission was "material" and "cannot be set aside," and that the ALJ "erred as a matter of law." (*Id.* at 5). However, Plaintiff has not explained how this alleged error caused harm. A party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful. *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009). In *Sanders*, the party attacking the agency's decision could not explain how the error made any difference to his claim; the Court considered the error harmless and affirmed the decision. *Id.* at 1708; *see also Rutherford v. Comm'r of Soc. Sec.*, No. 02-6008, 2003 WL 21375188 at *1 (6th Cir. Jun. 11, 2003).

The ALJ admitted in his decision that he omitted this limitation during the hearing, but explained that even if this limitation affected some jobs listed, it would not affect Plaintiff's ability to perform sedentary jobs. (Tr. 29). The DOT is generally silent with respect to requirements of overhead reaching. Social Security regulations describe the physical exertion requirements of sedentary work in general, and they specify that sedentary work involves minimal exertion demands, such as lifting no more than ten pounds and occasionally lifting or carrying articles such as docket files, ledgers, and small

tools.  *See* 20 C.F.R. §§ 404.1567, 416.967; SSR 83-10.  The ALJ could reasonably find that such activities rarely involve reaching overhead with the right -- or both -- upper extremities.

Specific sedentary listings in the DOT support this notion.  For example, the DOT listing for surveillance-system monitor, one of the sedentary jobs listed by the vocational expert (Tr. 587), specifies that the position calls for exerting no more than ten pounds of force occasionally, a negligible amount of force frequently "to lift, carry, push, pull, or otherwise move objects," and no reaching, handling or fingering.  U.S. Dept. Of Labor, *Dictionary of Occupational Titles* ("DOT") (4th ed. 1991) § 379.367-010.  By way of further example, the DOT description for microfilming document preparer, another sedentary job listed by the vocational expert (Tr. 587), states that required activities for the job also include exerting no more than ten pounds of force occasionally, a negligible amount of force frequently "to lift, carry, push, pull, or otherwise move objects," and no reaching, handling or fingering.  DOT § 249.587-018.

Even if a sedentary job requires occasional overhead reaching, there is no evidence that Plaintiff could not do the job, as he was not limited in reaching overhead with his *left* upper extremity.  Dr. Yuellig specified in August 2008 that Plaintiff was unable to use only his right upper extremity.  (Tr. 528).  Dr. Glaser found Plaintiff would have only slight difficulty reaching overhead, but only with his right arm (Tr. 248-249), and Dr. Ray stated that Plaintiff should avoid work that requires reaching overhead with the right upper extremity, but could handle objects without difficulty with his left hand (Tr. 494).

Therefore, the sedentary positions listed by the VE meet the residual functional capacity and other limitations, including the inability to reach overhead with his upper right extremity. Accordingly, the ALJ's decision was well supported by objective and other evidence in the record, and is fully consistent with the medical sources of record.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner, that Plaintiff was not entitled to disability income benefits and supplemental security income, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

**IT IS SO RECOMMENDED.**

Date:  March 30, 2010               s/ Timothy S. Black
                                    Timothy S. Black
                                    United States Magistrate Judge

DOUGLAS M. REDDEN,                          :          Case No. 1:09-cv-330
                                            :
      Plaintiff,          :          Judge Herman J. Weber
                                            :          Magistrate Judge Timothy S. Black
vs.                                         :
                                            :
COMMISSIONER OF                             :
SOCIAL SECURITY,                            :
                                            :
      Defendant.          :

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **14 DAYS** after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 (1985).